HOLMES, BOOTH & HAYDENS v. McGILL.

(Circuit Court of Appeals, Second Circuit. April 3, 1901.)

No. 57.

1. PATENTS—CONTRACT FOR MANUFACTURE AND SALE OF PATENTED ARTICLE—CONSTRUCTION.

A contract gave defendant the exclusive right for a term of 20 years to make and sell an article covered by a patent issued to plaintiff, which then had 7 years to run, and such other patents as had been or might be granted to plaintiff for improvements thereon or similar articles. It provided for the payment of a royalty consisting of a percentage of the net profits, which was to be reduced on the expiration of the basic patent on articles which had previously been made thereunder, and should thereafter be made under the later patents. A license was executed by plaintiff at the same time, covering a number of patents specified therein. On the expiration of the original patent the contract was modified, and another license, covering additional patents, was executed. Still later the contract was extended for 30 years, and to cover still other patents. All articles made and sold thereunder purported by their labels to have been made under some one or more of plaintiff's patents. *Held*, that such contracts were not for a division of profits on the business of making and selling the article covered by the original patent, during the life of the contracts, irrespective of the life or validity of the patents, but for the payment of royalties on articles to be made and sold under patents then existing.

2. SAME—LICENSES—LIABILITY FOR ROYALTIES.

So long as a licensee continues to manufacture and sell under a patent presumably valid, without having given notice of its invalidity, and without eviction, he is presumed to manufacture in accordance with his license, and the invalidity of the patent is no defense to a suit against him for royalties.

In Error to the Circuit Court of the United States for the Southern District of New York.

George W. McGill, a citizen of the state of New York and resident of the city of New York, brought four actions at law against Holmes, Booth & Haydens, a Connecticut corporation, before the United States circuit court for the Southern district of New York, to recover royalties under the contracts annexed to the complaints for the succeeding quarters of a year from April 1, 1895, to July 1, 1896. The four suits were, by order of court, consolidated, and were referred by written consent of the parties to Hon. William G. Choate "to hear and determine all the issues herein, a jury having been waived, and judgment may be entered upon his report or decision as such referee with the same force and effect as if the issues had been heard and decided by the court under stipulation for a trial by the court without the intervention of a jury."

Judgment was entered in the consolidated suit in favor of the plaintiff for $20,315.96 in accordance with the report of the referee. This writ of error was brought to review the judgment. The questions in the case are upon the construction of a contract dated March 23, 1876, and three amendments or additions thereto.

John E. Parsons, for plaintiff in error.

Henry G. Atwater, for defendant in error.

Before WALLACE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge (after stating the facts as above). In 1876, McGill was manufacturing metallic paper fasteners known as "McGill's Fasteners" under patents issued to himself as inventor, the fundamental patent having been issued July 24, 1866; and on March 23, 1876, entered into a written contract with the defendant, a corporation largely engaged in the manufacture of brass and copper articles. The portions of the contract which relate to the present controversy are as follows:

"Whereas, George W. McGill is now the sole owner of letters patent of the United States No. 56,587, issued to him July 24, 1866, for a metallic fastener, and is also sole owner of several letters patent of subsequent date issued to him for elaborations and modifications of said fastener, all of which subsequently dated patents are subordinate to and controlled by said letters patent of July 24th, 1866; and whereas, the firm of Holmes, Booth & Haydens are desirous of making and selling both in the United States and foreign countries all of said fasteners, and other articles made under said patents, and all articles made in the similitude of said fastener which the said McGill has now or may hereafter devise or patent: Now, therefore, it is agreed between the said George W. McGill and said Holmes, Booth & Haydens as follows: First. Said Holmes, Booth & Haydens are to have the sole and exclusive license and right to manufacture all of McGill's fasteners and suspending devices secured and controlled by the before-mentioned patents, or which may be secured by subsequent patents issued to said McGill. Second. The prices which the said Holmes, Booth & Haydens are to render as the cost of said goods shall not exceed twenty-five per cent. over the actual cost of the material and labor used in the manufacture; the price of ordinary brass to be 10 cents per pound above the average price of lake ingot copper. Third. The prices which the said McGill now pays D. M. Somers for the manufacture of said goods, a list of which is hereto attached, marked 'Exhibit A,' shall be considered a proper basis to commence upon; and such prices shall not be altered to pay more than the profit on manufacture above stated based upon brass at the foregoing rate. * * * Seventh. Said Holmes, Booth & Haydens are to have the sole and exclusive sale of these goods both in the United States and in foreign countries. * * * Tenth. Holmes, Booth & Haydens are to make up and constantly keep on hand a stock of said goods in such variety and quantity as will enable them to promptly fill all orders on them for the same, and will use their very best endeavors to extend and push the sales of the same. Eleventh. Holmes, Booth & Haydens are to keep a separate set of books, in which shall be entered all transactions relating to the stock and sales of these goods, and shall render monthly statements to the said McGill of sales of the same, and shall during each month, in preparing said statements, deduct the price paid for manufacturing the goods sold the preceding month from the net amounts for which they were sold, and shall each month place three-fourths of the balance to the credit of the said George W. McGill as his royalty, and subject to his order, except on such of said goods as they may have shipped out of the United States to foreign countries, and upon such shipments or sales his royalty is to be one-half the balance ascertained as aforesaid. The said books shall at all reasonable times be open and subject to the inspection of the said McGill or his agent. Twelfth. The said McGill is to sustain the validity of his patents at his own expense, and is also at his own expense to furnish

sample cards and cuts of his goods, and to pay the expense of advertising. * * * Fourteenth. This agreement shall continue for twenty years from its date, unless sooner dissolved by mutual consent; but at the expiration of ten years said Holmes, Booth & Haydens may terminate the same by surrendering to said McGill, his heirs or assigns, all the interest of Holmes, Booth & Haydens in said business at a valuation made by disinterested parties, which shall only embrace all goods on hand at cost as fixed by the conditions of this agreement; and at the option of Holmes, Booth & Haydens such special tools and machinery, etc., as may be connected with the manufacture of the goods herein referred to; but nothing for the good will of the business. And said Holmes, Booth & Haydens will then desist from the further manufacture and sale of said goods. *And after the expiration of the letters patent of July 24, 1866, or any reissue or extension thereof, the royalty to be paid to said McGill on the goods formerly made under that patent and which may be made under the remaining letters patent referred to in this agreement, and the license upon which it is based, of even date herewith, shall be a sum equal to one-half of the net profits arising from sales of all the goods specified herein, as ascertained under the articles of this agreement.* * * * Fifteenth. It is agreed that the present selling prices and discounts on said goods stand, but may be altered at any time when found necessary, by mutual consent. *And after the expiration of the letters patent of July 24, 1866, said Holmes, Booth & Haydens may regulate prices to meet the exigencies of the market according to their judgment.*"

The list of goods in Exhibit A contains six different articles made in different sizes. The entire price list includes 32 numbers. All these articles, except "Miscellaneous Fastener 16," were made or were claimed by McGill before the date of the contract of 1876 to have been made under patents to him. It appears, but not with certainty, that this fastener was represented on McGill's boxes before March, 1876, to have been patented. The point that substantially the entire Somers list consists of articles claimed to have been patented is of some importance because the referee was led to suppose that the fact was otherwise, and to advert to it in the construction of the contracts. At the date of the contract McGill owned the patent of March, 1866, and three other patents of April 20, 1875, for metallic fasteners, two patents for suspending devices, one for buttons, and three patents for clips, punches, and a press. The license mentioned in article 14, and executed by McGill cotemporaneously with the contract, granted an exclusive license to the defendant to manufacture and sell goods under these ten patents and three design patents. On July 24, 1883, the date of the expiration of the patent of 1866, the parties amended the contract of 1876 by erasing the parts of the fourteenth and fifteenth clauses which are in italics, and by including in the agreement 12 patents issued to McGill after March 23, 1876. On February 19, 1894, the agreement was extended for the term of 30 years from March 23, 1896, the date of the expiration of the contract of 1876; but on March 23, 1901, either party could terminate the contract upon previous written notice, in which event McGill could have the goods on hand at cost. It was also agreed as follows:

"The agreement thus extended shall include all patents for improvements in paper fasteners and similar devices, and all patents for improvements in tools, machinery, and appliances for use in manufacturing the same which may be obtained or acquired during the ——tended term by the said George W. McGill, his heirs and personal representatives." '

The business of manufacturing these metallic fasteners became exceedingly profitable to both parties. McGill was a director in the

defendant corporation, which made its fastener business a separate department both at the Connecticut factory and at the New York office, where McGill had a desk, and where, as well as the factory, he was potential in directing the business and the manufacture. He was active in developing sales, was prolific in patents, was exacting at the factory, and the fastener business was much within his control and management. He had been also a patent solicitor, and the defendant intrusted him exclusively with the designation, upon the labels and boxes, of the patents under which the articles were claimed to have been made, and the designation was made in accordance with his instructions. The defendant paid no attention to the particulars upon these labels, or to the patents, and supposed that the articles were being made under valid patents, until from some cause differences arose between the parties, which culminated, in 1895, in a suit by the plaintiff against the defendant for alleged fraud in its previous accounting, and an examination was then had by the defendant in regard to the patents upon which, if any, the goods were being manufactured. Upon this question the referee found as follows:

"(3) Prior to April 1, 1895, and thereafter to March 1, 1896, defendant made and sold flat and round head fasteners with loops in their heads as described in plaintiff's alleged patent No. 498,138, dated May 23, 1893; and after March 1, 1896, the defendant made and sold such fasteners without such loops in their heads. (4) Between April 1, 1895, and July 1, 1896, the defendant, in the manufacture of flat and round head fasteners, did not use the combination set forth as the invention described in plaintiff's alleged patent, dated October 2, 1883. The defendant did make said flat and round head fasteners during said period, and for several years prior to April 1, 1895, with one foot longer than the other, but the other features or inventions described in said patent were not used by it during said period between April 1, 1895, and July 1, 1896. The drawing in plaintiff's patent of July 24, 1866, No. 56,587, shows a fastener made with feet of different lengths, and that feature was old, and on that ground unpatentable, on October 2, 1883. (5) The flat and round head fasteners made and sold by the defendant during the period from April 1, 1895, to July 1, 1896, were made by the process described in plaintiff's alleged patent of December 3, 1889, numbered 416,510. (6) Otherwise than as aforesaid, the defendant did not, in fact, use in the manufacture of flat and round head fasteners made and sold during said period from April 1, 1895, to July 1, 1896, any of the inventions described in, or purporting to be described in or secured by, any unexpired patent issued to the plaintiff, but said goods were manufactured in accordance with the invention covered by a patent granted to the plaintiff on the 24th day of July, 1866, for a metallic fastener, which patent had expired prior to the manufacture of any of said goods so sold during said period. (7) There is no invention, and nothing embodying the exercise of the inventive faculty, in the alleged invention set forth or described in patent No. 498,138, dated May 23, 1893. * * * (10) From April 1, 1895, to July 1, 1896, the flat and round head fasteners made and sold by the defendant were packed in metal boxes, and the boxes were packed in wooden packages, and both on the metal boxes and the wooden packages were the words 'McGill's Fasteners' and 'Holmes, Booth and Haydens. Manufacturers,' and patent dates October 2, 1883, and December 3, 1889. Said marks were used with the knowledge and consent of the plaintiff."

The process patent of December 3, 1889, was an invention of Ralph J. Shipley, a foreman in the defendant's factory, was assigned to McGill, and the defendant was licensed to use it. The patent described a machine which had for its object an improved method of making the duplex-pronged metallic fasteners, known as "McGill's Fasteners." The invention was the only one described in any un-

expired patent which was used by the defendant between April 1, 1895, and July 1, 1896, except that before March 1, 1896, the defendant made fasteners as described in a patent of May 23, 1893, which was without validity. The referee was of the opinion that the contract of 1876 and its amendments was an agreement in regard to the division of the profits of the business of the manufacture and sale of McGill's fasteners and the articles connected with them during the life of the contract, irrespective of the life or the validity of the patents, and that McGill's share in the profits, which was called a "royalty," continued as long as the business continued. The contract is inartificially drawn, uses commercial terms—such as "interest in the business"—in a way which blurs, rather than expresses, the intent of the parties, and was also negligently drawn, in that it nowhere expressly states the patents to which it actually related. The preamble mentions only fasteners of 1866 and improvements thereon, which were four in number; but by the first clause the defendant was to have an exclusive license to sell the patented fasteners and suspending devices, which were seven in number, and to use patents subsequently to be issued. The license included three additional patents for clips, a punch, and a press, and two design patents. The contract was for the manufacture and sale of all these articles, called in the contract "goods," under all the patents issued and to be issued; and upon sales in this country McGill was to have three-quarters of the net profit, but after the expiration of the basic patent of 1866 he was to have upon goods formerly made under it and then made under the remaining letters patent a sum equal to one-half the net profits. This clause by itself implies—and, we think, plainly implies—that royalty for the use of the expired patent was to cease, but was to continue upon goods made under the unexpired patents which were formerly made under the expired patent. On the day when the patent of 1866 expired, the parties erased the provision reducing the royalty to one-half of the net profits, and McGill included in his license 12 new patents, but no new intent was manifest to change the principle upon which the first contract was based. Up to this point of time the word "royalty" seems to have had its ordinary meaning,—"a payment reserved by the grantor, and payable proportionately to the use made of such right." The provision of February, 1894, that the original contract, enlarged as to time, should include patents for improvements in machinery and appliances for use in manufacturing fasteners, meant that the same right to use this class of patents was granted to the defendant that had been granted in the original contract, and that, on the other hand, McGill's compensation for the use of such patents was to be measured upon the principles that had been therein provided. The fasteners bore the general name of McGill's flat and round head fasteners, and the boxes bore labels which designated, either correctly or incorrectly, the date of the patents under which they purported to have been made; but the defendant followed in this regard the directions of McGill, which, in 1894, it requested him to furnish. By another agreement of February 19, 1894, the parties amended the original contract as follows:

"Notwithstanding anything in the said contract, Holmes, Booth & Haydens shall bill flat and round head fasteners at ten per cent. less than the present factory cost prices as now rendered, until the selling prices shall be restored to within seventy-five per cent. of the original selling prices."

This was 11 years after the patent of 1866 had expired, and the plaintiff contends that the amendment is an admission of his right to claim royalties on flat and round head fasteners, and therefore an admission of his right under any patent. It was an admission of the defendant's obligation to pay royalties, but not necessarily an admission of an obligation growing out of the license to use an expired patent. It admitted that under the contract royalties were due, and they were due because they were made under patents nominally in force in 1894. These admissions created no estoppel against the defendant in favor of the plaintiff, for he did not rely and act upon them, nor was he lured by them to his hurt. On the contrary, he was the person who led the defendant to rely upon the validity of the patents. Our conclusion is that the contract was for a royalty upon goods to be made and sold from time to time under existing patents, and not for a share of the profits of a business in the manufacture and sale of goods or articles called "McGill's Fasteners." The patent of 1866 had in 1876 but about seven years of life, and we do not think that the contract shows an intent of the parties that royalties or profits were to be paid for 20 years upon all goods known as "McGill's Fasteners," while it does show that during the contract profits were to be paid upon goods made under licenses to use unexpired patents and upon which the defendant would presumably have a monopoly. The question is whether, inasmuch as the defendant made the goods by process described in the patent of December 3, 1889 (No. 416,519), and a part of the goods as described in the void patent of May 23, 1893, it is liable to the plaintiff for the royalty. The process patent was specifically for the manufacture of the McGill fasteners, was embodied in a described machine, was one of the patents mentioned in the agreement of February, 1894, and the defendant accepted a license for its exclusive use. The terms of the original contract were extended to include this patent, and by those terms the defendant was to pay a specified royalty upon all goods made from time to time under the plaintiff's unexpired patents for which it had an exclusive license. It is true that the royalty of three fourths of the net profits became an enormous royalty upon a single-process patent, but it was the pecuniary consideration which the contract gave to McGill for its use. The loose agreement which the defendant entered into for 20 years made no distinction in regard to royalties between patents of large value or those for a worthless improvement. The royalty was to be paid upon goods "which may be made under the remaining letters patent referred to in this agreement and the license upon which it is based," and the amendment of 1883 was equally lacking in exactness. Goods were made for three-fourths of the time described in the consolidated suit in the form described in the void patent of May, 1883. The contract was silent in regard to the consequences of the invalidity of patents. It simply provided that McGill was to sustain their validity at his own expense. On August 2 or 3,

1895, the plaintiff had verbal notice that the account of July 1, 1895, did not include royalty on fasteners, and on October 28, 1895, he had written notice of refusal to pay royalties, on the ground of invalidity of the patents. In an action by a licensor against a licensee to recover royalties upon sales made under an exclusive license upon an invalid patent, which was, at the time when the account accrued, apparently valid and in force, and from which there had been no eviction, the invalidity of which had not been declared by an adjudication under legal proceedings, and no notice had been given by the licensee of its refusal to pay on account of its defects, such invalidity is no defense to the suit. As long as the licensee continues to manufacture under a patent presumably valid, without having given notice of its invalidity and without eviction, he is presumed to manufacture in accordance with his license. The cases of Marston v. Swett, 66 N. Y. 211, and Id., 82 N. Y. 526, are leading authorities to this effect. The law is stated in Lawes v. Purser, 38 Eng. Law & Eq. Rep. 48, by Erle, J., as follows:

"If the plaintiff believed the patent to be valid, and the defendants believed so, too, it seems to me that the defendants must pay for the privilege until they can show that the patent has been rescinded or revoked, or that notice has been given to the plaintiff that the defendants will not pay any more under the contract."

White v. Lee (C. C.) 14 Fed. 789; Birdsall v. Perego, 5 Blatchf. 251, Fed. Cas. No. 1,435; Stott v. Rutherford, 92 U. S. 107, 23 L. Ed. 486; Eureka Co. v. Bailey Co., 11 Wall. 488, 20 L. Ed. 209. A list of the cases in this country upon this point is contained in 3 Rob. Pat. 696, note 5. It follows that from April 1, 1895, to October 28, 1895, the defendant was liable for royalty under patent of May, 1893, and during the entire period in the consolidated suit under patent No. 416,510. The judgment of the circuit court is affirmed, with costs.