JOHN E. CREW AND ANOTHER v. B. H. FLANAGAN AND ANOTHER, COPARTNERS *d.b.a.* STEARNS MANUFACTURING COMPANY, AND ANOTHER.[1]

July 30, 1954.

No. 36,181.

[1]Reported in 65 N. W. (2d) 878.

550

*Best, Flanagan, Rogers, Lewis & Simonet,* for appellants.

*R. J. Quinlivan, Atwood & Quinlivan,* and *David W. Louisell,* for respondents.

NELSON, JUSTICE.

Plaintiffs bring this action for an accounting of royalties which they claim are due and owing from defendants, as licensees under a patent license agreement, over a period extending from April 1, 1949, to the time of trial. Defendants counterclaim for all royalties paid by them to the plaintiffs, as licensors, over a period extending from July 1, 1947, to March 31, 1949, in the sum of $5,370.17.

The matter was tried without a jury, and findings were entered denying relief to plaintiffs and granting relief to defendants on their counterclaim in the amount of $5,370.17. Plaintiffs moved in the alternative for amended findings and conclusions of law or for a new trial, which motion was denied, and plaintiffs appeal from the judgment thereafter entered.

The facts of importance here are as follows:

Plaintiffs, residents of Minneapolis, Minnesota, who had always been actively interested in hunting and shooting activities, made application for patent February 24, 1947, on a certain gun case which they had devised and which they then felt served a definite need in its field.

Defendants were manufacturers in St. Cloud, Minnesota, operating as copartners under the firm name of Stearns Manufacturing Company in 1947, later incorporating under the same name and thereafter carrying on their business activities through the corporate organization. Defendants were at the time manufacturing frost shields and were looking for additional articles to manufacture, including sporting goods items.

Plaintiff Charles P. Wilbert and defendant M. H. O'Link were friends of some years' standing, and Wilbert discussed with defendants the possibility of their manufacturing the gun-case device. These discussions led to an agreement in writing entered into between the parties May 31, 1947.

The plaintiffs were identified as licensors and defendants as licensees in this agreement, which recites that licensors are the owners of the entire right, title, and interest to the "gun case" invention disclosed and claimed in application for U. S. Patent S. N. 731312; that the licensees desire to acquire and licensors desire to grant a license to manufacture, sell, and use the "gun case" in the United States of America and the Dominion of Canada.

It appears from the evidence that plaintiffs, in their discussions with the defendants that led to the license agreement, represented that they expected to obtain letters patent within a period of 18 months. That this representation was made was denied by the plain-

552

tiffs. The trial court found that such statements had been made by the plaintiffs but that they were made innocently and therefore in effect without fraud or deceit.

The license agreement of May 31, 1947, provided for royalties of ten percent on all money received from the manufacture and sale of the gun cases. This agreement was amended November 3, 1947, to provide for royalties of ten percent on the first 2,500 gun cases manufactured and sold and five percent on all gun cases manufactured and sold in excesss of 2,500.

The distinctive features of the gun case, as described in the original patent *application,* were a complete zipper down one side and over each end, allowing the case to be laid in a "substantially flat condition" for rolling into a compact roll, plus a flexible lining, a flexible waterproof exterior, and a flap pocket at the small end of one side of the case to receive the small end of the gun barrel.

After the license agreement was executed, plaintiff Crew aided defendants in commencing the manufacture of the case. The characteristics of the case were substantially changed by the time production began. The original plan of having a full-length zipper extending around both ends was abandoned and, although a long zipper was utilized, it extended only to near the end of the case where it was riveted. Plaintiffs' application claim 2 (patent claim 1) provided for a pocket to secure the end of the barrel of the gun, to be constructed of a flap sewed to one of the sides of the case. When the full-length wrap-around zipper was abandoned, however, this pocket became unnecessary since the riveted end provided a natural pocket to receive the barrel end. To conform with this change, application claim 12 (patent claim 2) was amended, *after* conclusion of the trial below, to describe the pocket as one "formed at the small end of said case for receiving the end of a gun barrel."

Plaintiffs' original patent application included nine claims, each of which featured a full-length zipper and each of which was rejected. The claims were subsequently amended and enlarged but again rejected at various times. In his fifth action on the application, the patent examiner only allowed claim 2, which provided for

the flap pocket secured to one side of the case sheet at the small end. The board of appeals sustained the finding of the examiner and held the other claims unpatentable for lack of novelty over the prior art. After a request for reconsideration was denied, plaintiffs on April 10, 1951, cancelled all claims except claim 2 for the flap pocket. On April 17, 1951, this claim was allowed by the examiner. Therefore, at the time of trial below, June 14 and 15, 1951, only the one claim had been patented, and this four years after the license agreement between plaintiffs and defendants had been entered into. However, a Canadian patent was issued to the plaintiffs on November 14, 1950.

The Stearns Manufacturing Company in fact commenced the manufacture and sale of the gun cases July 1, 1947. From that time to March 31, 1949, 20,108 full-zippered gun cases were sold for a dollar volume of $95,561.90. There was paid to the plaintiffs, as royalties on this amount of sales, the sum of $5,370.17. The defendants refused to make further royalty payments after March 31, 1949, on the ground that plaintiffs had failed to obtain the patent according to plans and representations; that their claims had been repeatedly rejected by the patent examiner; and that the alleged or claimed invention in fact was not patentable, constituting only a combination through rearrangement of various items made more useful through the skill of the plaintiffs with the prior art before them but not through the use of a patentable invention. The defendants further claimed as grounds for their repudiation of the license agreement that the gun case as devised was thought to be patentable through mutual mistake and that there was a total failure of consideration in that the defendants acquired no exclusive rights such as the license agreement purported to grant to them. No further royalty payments of any kind were thereafter made by defendants.

Although the gun cases apparently proved to be a commercial success, there are strong indications in the record that they have been copied quite generally by other manufacturers.

At the time of trial plaintiffs claimed that the unpaid royalties under the license agreement amounted to $10,415.14, that amount having accrued during the period from April 1, 1949, to Febru-

ary 28, 1951, upon sales of 58,853 units sold at a dollar volume of $208,302.97.

Plaintiffs claim that, because of their interest in hunting and shooting activities over a period of years, they were familiar with the type of gun cases manufactured prior to their undertaking in the field and that the present case differs from cases previously manufactured and on the market in that it opens up fully so that it can be dried out; it has handles plus a fly to protect the gun from the metal parts of the zipper; it has a repellant cover over the sheepskin lining; and it has a safety feature in that the danger of discharging the gun during withdrawal from the case or while closing the case is avoided because of the full-length zipper.

The defendants denied the right of plaintiffs to recover any of the royalties accrued since April 1, 1949, contending that the gun case devised by plaintiffs was neither a new nor useful idea as such in the manufacture of gun cases and that the United States patent finally issued on November 13, 1951, had no relation to the gun case being manufactured and sold and furnished no protection to the licensee because of its invalidity. The defendants contend that there is no novelty in the gun case invented by plaintiffs and that the novelty of the gun case is a question of fact; that at least ten claims were rejected by the patent examiner and that the two claims finally allowed had only to do with two types of pockets to be used to secure the gun barrel within the case, both of which were without novelty; that the patented gun case lacks any new and useful art necessary for the issuing of a valid patent and that therefore there was a failure of consideration for the license agreement.

The main issues appear to be as follows:

(1) Was the license agreement supported by a valid consideration or was there a failure of consideration justifying the defendants, as licensees, in repudiating the license agreement and refusing to pay any further royalties thereunder?

(2) Does the gun case as now patented present any valid patentable feature and does the gun case as manufactured and sold by the defendants, as licensees, embody any distinctive feature of the

gun case as now patented and, if so, is the patent a valid one as to the claims granted?

(3) Are the defendants, as patent licensees under the license agreement entered into with the full understanding on May 31, 1947, that a patent had been applied for February 27, 1947, and entered into openly on both sides, plaintiffs assuring defendants as to the patentability of the device but such claims innocently made in the belief that it was patentable and there being no claim of fraud or deceit on the part of the defendants, entitled to a refund of royalties paid them for the period from July 1, 1947, to March 31, 1949, in the amount of $5,370.17?

■ We are concerned here with a suit for royalties. We must keep in mind at the outset that an action to recover royalties under a license or assignment of patent rights—diversity of citizenship or any other special grounds for asserting federal jurisdiction not being involved—must be brought in a state court. It is also the rule that a suit by a patentee for royalties under a license or assignment granted by him or for any relief sought with respect to a contract which permits the use of the patent is not a suit under the patent laws of the United States and cannot be maintained in a federal court as such. Such suits are therefore maintainable in the state court even though the defendant denies the contract and the plaintiff's title to the invention. So it has been held, and the holding is supported by good authority, that it is no objection to the prosecution of a royalty claim suit in a state court that the validity or the construction of the patent may become and is involved, providing the suit is one in contract and the questions under the patent laws arise collaterally. Wilson v. Hentges, 26 Minn. 288, 3 N. W. 338; Van Norman v. Barbeau, 54 Minn. 388, 55 N. W. 1112; Albright v. Teas, 106 U. S. 613, 1 S. Ct. 550, 27 L. ed. 295; Pratt v. Paris Gas Light & Coke Co. 168 U. S. 255, 18 S. Ct. 62, 42 L. ed. 458; Luckett v. Delpark, Inc. 270 U. S. 496, 46 S. Ct. 397, 70 L. ed. 703; Coleman v. Whisnant, 225 N. C. 494, 35 S. E. (2d) 647; International Fastener Co. v. Francis Mfg. Co. (W. D. N. Y.) 259 F. 311.[2]

2For further citations on this point, see Annotation, 167 A. L. R. 1114, 1123.

■ Defendants assert as a defense to plaintiffs' action that there is a total failure of the consideration for which the defendants agreed to pay royalties and that therefore they are not bound to perform under the license agreement. They deny that there was in any sense a valid patent. They assert that the consideration for which they agreed to pay royalties was the conveyance to them of the exclusive right to make, use, and sell full-length zipper gun cases and that this right has not in fact been conveyed by the plaintiffs to them, first because the patent is invalid and second because the full-length zipper feature was not patentable and therefore they could not and did not get the exclusive right to make, use, and vend such a gun-case device. Of course, that for which the defendants agreed to pay stipulated royalties was to be found only in the monopoly which the plaintiffs purported to grant. If and when the defendants found themselves deprived of this exclusive privilege, either by patent invalidity or lack of invention, they occupied no vantage ground over any other manufacturer.

The defendants took the position, when they repudiated the license agreement on March 31, 1949, that there was in fact no patent protection, that there were no longer any exclusive patent rights under the license agreement, and that what they were manufacturing was in fact free and common to all. The question which of necessity arises in a suit of this kind is whether the defendants are in a position to contest the validity of the patent or whether instead they are estopped from denying its validity. The defendants have taken the position on appeal that the purported license agreement was an assignment of patent rights rather than a licensing agreement, in spite of the terminology used in the agreement itself, and that, although a licensee is estopped from denying the validity of the licensor's patent in an action for royalties, the defense of invalidity of patent is one open to an assignee of patent rights. Whether an agreement contemplates a license or assignment of patent rights depends upon the legal effect of its provisions. Waterman v. Mackenzie, 138 U. S. 252, 11 S. Ct. 334, 34 L. ed. 923. To constitute an assignment, the agreement must convey the exclusive right to make,

use, and vend the entire invention. See, Ellis, Patent Assignments and Licenses (2 ed.) § 58.[3]

It appears in the instant case that the license agreement in question was prepared by the patent attorney representing the plaintiffs and that it answers in form every requirement of an exclusive license. Of course, an exclusive license reserving nothing to the grantor except the right to receive compensation is legally tantamount to an assignment. In this license agreement we have reservation of royalties provided for and no single lump-sum payment as the purchase price. We have also the customary provisions for reversion of title to plaintiffs under certain specified conditions and, even though the grant states that the exclusive license shall continue to the end of the term of any patent or patents which may be issued on the application and to the end of the term of any reissue or reissues which may be granted on said patent or patents, the agreement provides that the rights thereunder granted shall not be transferable without the written consent of the licensors.

We conclude from the record, findings of fact, and conclusions of law, including the memorandum attached, that the court below considered the agreement to be a license agreement and so found. The parties to the action having proceeded on that theory below may not choose to shift their position on appeal. Gandrud v. Hansen, 215 Minn. 474, 10 N. W. (2d) 372; Olson v. Shephard, 165 Minn. 433, 206 N. W. 711. It has been held that an appellate court can base a decision on a ground not presented to the court below where the question raised for the first time on appeal is decisive (Skolnick v. Gruesner, 196 Minn. 318, 265 N. W. 44) and that this court can dispose of a case in disregard of the theory of the case in the trial court, even though the party is not allowed to shift his position himself. Rigby v. Nord, 208 Minn. 88, 292 N. W. 751. We see no compelling grounds requiring us to hold that this license agreement was in fact an assignment. We will for the purposes of this case

[3]Rude v. Westcott, 130 U. S. 152, 9 S. Ct. 463, 32 L. ed. 888; American Type Founders v. Dexter Folder Co. (S. D. N. Y.) 53 F. Supp. 602; Green v. Le Clair (7 Cir.) 24 F. (2d) 74; Krentler-Arnold Hinge Last Co. v. Leman (1 Cir.) 13 F. (2d) 796.

558

continue to treat it as a license agreement, conscious of no necessity to declare it an assignment of patent in order to dispose of the issues in this case.

■ We think that the weight of authority under recent cases permits the licensee to raise the defense of invalidity in an action for royalties accrued *after* he has, by giving notice thereof, *repudiated* the license, even though the patent has not been held invalid in third-party proceedings, unless the licensee has contracted to the contrary. See, Ellis, Patent Assignments and Licenses (2 ed.) §§ 810, 811, and cases therein cited. Repudiation of course involves the question of estoppel against the licensee interposing the defense of invalidity of the patent in an action brought to recover royalties. While it seems to be quite well established that the licensee may be barred from taking the initiative in showing that the patent is worthless, it does appear, however, that a different situation is created when a third party has proved its invalidity in a court of competent jurisdiction. But the view now supported by the weight of authority in recent cases is that the licensee may dispute the validity of the patent under which he is licensed after he has repudiated the license, even though such patent has not been shown to be invalid in third-party proceedings.[4]

This court said in Wilson v. Hentges, 26 Minn. 288, 290, 3 N. W. 338, 340:

"* * * The license assumes to give a right in its nature exclusive—a thing which has no existence if the patent be void, for everybody possesses the right. Therefore a license or grant of a right to

[4]Mudgett v. Thomas (C. C. S. D. Ohio) 55 F. 645; Brown v. Lapham (C. C. S. D. N. Y.) 27 F. 77; Holmes, Booth & Haydens v. McGill (2 Cir.) 108 F. 238; Martin v. New Trinidad Lake Asphalt Co. (D. N. J.) 255 F. 93, and cases therein cited; Schutte & Koerting Co. v. Wheeler Condenser & E. Co. (E. D. Pa.) 295 F. 158, 162; Lathrop v. Rice & Adams Corp. (W. D. N. Y.) 17 F. Supp. 622; Universal Rim Co. v. Scott (N. D. Ohio) 21 F. (2d) 346; White v. Lee (C. C. D. Mass.) 14 F. 789; Harlow v. Putnam, 124 Mass. 553; Ellis, Patent Assignments and Licenses (2 ed.) §§ 810, 811.

sell in such case furnishes no valid consideration for a promise on the part of the licensee or grantee."

In reading the license agreement in the instant case, it is clear that the licensee did not covenant therein directly or indirectly not to contest the validity of the patent license. The licensee, however, before contesting the validity of the patent, must repudiate the license agreement. This the defendants did on or about March 31, 1949, and then later raised the defense of failure of consideration and invalidity of patent in their answer to plaintiffs' suit for royalties.

The necessity of this rule seems plain, for it would be unreasonable for a licensee to have the advantage of the patent in his commercial dealings with the world at large and repudiate it in his dealings with his licensor when it comes to paying royalties. He must take a stand which is consistent for he cannot be allowed to affirm and disaffirm the patent at one and the same time. If in effect the licensee is evicted by failure of consideration to the extent that other manufacturers produce the same article and he stands helpless to protect himself under the license agreement, then he would in fact be dispossessed against his will and ought not to have to pay further rent for the right to produce the article. Just as it has been held that estoppel does not apply to a tenant as between landlord and tenant after he has relinquished possession of the premises, so it has been held that a licensee in the patent field can dispute the validity of the patent after he has repudiated or relinquished the license for all purposes. See, White v. Lee, *supra;* Mudgett v. Thomas, *supra;* Brown v. Lapham, *supra;* Holmes, Booth & Haydens v. McGill, *supra;* Martin v. New Trinidad Lake Asphalt Co. *supra;* Ellis, Patent Assignments and Licenses (2 ed.) § 811. It is the rule, however, that as long as the invalidity of a patent has not been judicially declared and the licensee continues to operate under the license without repudiation or notice of such force and effect as will place him in the position of an infringer, there is no such want or complete failure of consideration as will permit the licensee to refuse to pay royalties which have been previously earned. Universal Rim Co. v. Scott, *supra;* Lathrop v. Rice & Adams Corp. *supra.*

If we turn to the general principles involved as regards permitting a licensee to revoke a license without the consent of the licensor, it must first be pointed out that, after the license has been repudiated for all purposes, there is no estoppel by conduct, such as constitutes the basis for the decisions referred to in Ellis, Patent Assignments and Licenses (2 ed.) § 811, heretofore cited. The only possible estoppel would therefore be estoppel by deed or covenant. The rule that estoppel does not apply after the license has been repudiated has been followed in actions at law as well as in equity. See, Harlow v. Putnam, *supra;* Mudgett v. Thomas, *supra.* In the latter case the court said (55 F. 649) :

"* * * It would be against public policy to extend the doctrine of estoppel beyond the strict letter of the rule, for in Manufacturing Co. v. Gormully, 144 U. S. 234, 12 Sup. Ct. Rep. 632, Justice Brown says: 'It is as important to the public that competition be not repressed by a worthless patent, as that the patentee of a really valuable invention should be protected in his monopoly.' "

This statement of Mr. Justice Brown was quoted in Universal Rim Co. v. Scott, *supra.*

■ Even though the patent has not been judicially held invalid, if the licensees, as in the case of the defendants here, give the licensors clear and unequivocal notice of their decision to repudiate the license on the ground that the patent is invalid, then they may avoid payment of royalties from the date of such notice of repudiation. See, Martin v. New Trinidad Lake Asphalt Co. *supra;* Ellis, Patent Assignments and Licenses (2 ed.) § 814. In the Martin case it was held that the repudiation of the license was within the rights of the licensee, *i.e.,* that the contract did not forbid such action, that the notice given was adequate, that the licensee from the time of repudiation had ceased all use of the patent as protection, and that the effect thereof was to limit the recovery of royalties to the date of such repudiation.

Recent authorities involving patent rights seem to hold that, while the right of a licensee to repudiate the license prior to a court decision of invalidity is admitted by most courts, such right

is not as firmly established as the right to repudiate after a court decision of invalidity. But it appears to us that, if the requisites of a repudiation are present, the repudiation should be given effect although made prior to a court determination of invalidity of the patent. Of course, it is important in order to effect the repudiation that the licensee should advise the licensor that he no longer considers the articles being manufactured under the license agreement to be covered by that agreement. See, Hunt v. Moline Plow Co. (C. C. N. D. Ill.) 52 F. 745; Ellis, Patent Assignments and Licenses (2 ed.) § 570. But here that was clearly brought home to the plaintiffs by the defendants at the time of their refusal to make further royalty payments.

The court below, in determining that there was a failure of consideration for the license agreement and that the patent claims were invalid, proceeded on the theory that an improvement to be patentable must show more ingenuity than the mere work of a skilled mechanic and that the new device, however useful it may be, must reveal something more creative from the inventive view than was shown in the gun-case device. The fact that a designer of a new article or gadget of some type adds something to prior art which makes it more useful does not necessarily show invention, and the commercial success of a patented product is not conclusive on the question of "invention" and may not replace a positive conviction of lack of invention. Toledo Pressed Steel Co. v. Standard Parts, Inc. 307 U. S. 350, 59 S. Ct. 897, 83 L. ed. 1334. The mere shifting of pieces or panels of material, old in the art, around to accomplish a new purpose is not necessarily the exercise of the mechanical skill which makes the object patentable, but merely the exercise of mechanical skill to be expected of any skilled operator or designer in such material with the prior art before him. Steps taken to rearrange various articles may often accomplish the result desired, but this may be only the result of the skill applied and add nothing patentable to the prior art. See, Warner Bros. Co. v. American Lady Corset Co. (S. D. N. Y.) 48 F. Supp. 417; Great A. & P. Tea Co. v. Supermarket Corp. 340 U. S. 147, 71 S. Ct. 127, 95 L. ed. 162;

Hutchinson Mfg. Co. v. Mayrath (10 Cir.) 192 F. (2d) 110; Red Devil Tools v. Hyde Mfg. Co. (D. Mass.) 96 F. Supp. 502. The question of novelty is one of fact for either the court or jury to decide. The court below found that the patent here was invalid for want of invention, that the gun case as manufactured did not embody the features of the gun case as contemplated at the time the license agreement was signed, and that therefore the consideration for the license agreement failed. This finding affirms the conclusion that defendants were justified in repudiating the agreement when they did.

■ It is a well-established rule that, where the repudiation takes place prior to a court decision of invalidity, royalties are payable up to the time when notice of repudiation is given to the licensor. See, Ellis, Patent Assignments and Licenses (2 ed.) § 815.

In Drackett Chemical Co. v. Chamberlain Co. (6 Cir.) 63 F. (2d) 853, 854, the court determined that the licensee was estopped to deny validity or infringement of patent as to royalties accruing before decree adjudging it invalid. The court in referring to the license agreement spoke of "the monopoly which the grant confers: the right of property which it creates," and stated that when this monopoly is destroyed and the exclusive rights purported to have been created by the patent are no longer exclusive (are judicially decreed to be no longer exclusive) but are thrown open to the public at large, there has been a complete failure of consideration—an eviction— which should justify termination of the contract. But the court also said that, prior to such eviction, the mere invalidity of the patent is properly held not to be a sufficient defense because the licensee may still continue to enjoy all the benefits of a valid patent and that, as the patent may be respected, the licensee would then have just what he bargained for, citing McKay v. Smith (C. C. D. Mass.) 39 F. 556. The court in the Drackett case held that under the authorities on which it relied and had reference to there was no such mistake of fact (the validity of patents) as would justify awarding restitution of royalties already paid. Under the facts of that case, the court held that there was a practical eviction and, because of such eviction and in view of the notice theretofore given, the obliga-

tion to pay royalties should cease as of the date of such decision but that all royalties accruing prior to that date must be paid. Aside from our opinion that the "eviction" may result from a justifiable repudiation made prior to a judicial decree of patent invalidity, this court is in agreement with the holding of the Drackett case as to royalties paid prior to "eviction."

It was similarly pointed out in Headley Good Roads Co. v. Barber Asphalt Paving Co. (3 Cir.) 292 F. 119, that, since the licensee enjoyed the benefits of the license agreement and manufactured and sold the article under the patent prior to eviction, it must in justice pay the stipulated royalties accrued prior to eviction date.

In Warner Bros. Co. v. American Lady Corset Co. (S. D. N. Y.) 48 F. Supp. 417, it was held that the invalidity of a presumably valid patent did not absolve licensee under patent from liability for royalties under the license agreement prior to cancellation of the license. See, Lathrop v. Rice & Adams Corp. *supra,* and cases cited.

We reach the conclusion in the instant case that the license agreement was as duly deliberative upon the part of the defendants as on that of the plaintiffs and, therefore, that there was no such mistake of fact (invalidity of patents) as would warrant a recovery of royalties already paid. We think the rule of law applicable here is that the defendants are estopped to deny the validity of the patent in respect to royalties accrued prior to repudiation of the license agreement. Therefore, although we have held that defendants are not estopped to set up facts constituting eviction as a means of repudiation thus allowing them to question the validity of the patent and the consideration supporting the license agreement, we further conclude that all royalties accrued prior to March 31, 1949, the date of repudiation notice, belong to plaintiffs as licensors and may be retained by them, and defendants are not entitled to an award for their recovery.

We are unable to find in the evidence any insufficiencies justifying a reversal of the court's findings of fact and conclusions of law establishing failure of consideration and invalidity of patent. We conclude, as did the court below, that the plaintiffs are not entitled

564

to recover royalties accrued after March 31, 1949. It is our conclusion, however, that any and all royalties earned and paid under the license agreement prior to April 1, 1949, are not recoverable under defendants' counterclaim and that the order to repay royalties earned prior to that date and paid in the sum of $5,370.17 should be reversed.

Judgment affirmed in plaintiffs' suit for royalties accrued after March 31, 1949, and reversed as to the award of $5,370.17 on defendants' counterclaim.

